Number 181351, LP Solutions LLC v. Craig J. Duchossois. Counselor, you can tell us the correct pronunciation of the defendant's name. We've all been about wondering. Your Honor, I understand it's Duchossois. We've been using Duchossois on our end, but there may be a different version. Okay. Proceed. Your Honor, Daniel Murphy for Plaintiff Appellant, LP Solutions. May I reserve two minutes for rebuttal? Yes, you may. Thank you, Your Honor. The question presented in this appeal is whether there are sufficient minimum contacts between defendants and the State of Maine to support specific personal More particularly, the critical issue is whether jurisdiction over defendants in Maine was foreseeable under the purposeful availment element. At the trial court level, Judge Hornby determined that LP Solutions met its burden under the relatedness and the reasonableness elements. He also concluded that defendants' contacts were plainly voluntary under the under the second subprong of that purposeful availment element. On de novo review, this court should conclude that the requirements for purposeful availment and the other elements have been satisfied and that jurisdiction is proper in the State of Maine. Looking at the standards for purposeful availment, it is important to note that under existing precedent, only one contact with the forum is needed so long as it is meaningful. Under Burger King, the test for foreseeability requires that defendants' contacts must be of a nature that defendants could reasonably anticipate being hailed into court. This court has analyzed whether the defendant has benefited from its forum contacts in a way that made jurisdiction foreseeable. The Supreme Court in Burger King also stated that a defendant purposely avails itself when its actions create a substantial connection with the forum. This court has stated that this substantial connection can arise whenever the defendant deliberately directs his efforts toward the forum state. Based on these standards, the inquiry is, are there forum contacts where defendants deliberately directed their efforts to the State of Maine? Are there forum contacts by which defendants benefited such that jurisdiction here should not be a surprise? Also under the contract plus analysis applicable to contract actions, there is also analysis of whether continuing obligations between the defendants and resident forums have been created. The answer to these questions is yes. In our brief, we have noted a number of contacts that are substantial and meaningful. The key contacts I would like to identify start with the contracts themselves, the option agreements and the State of Maine. This speaks to the continuing obligation aspect of the contract plus analysis. In addition, in the appendix at the... It's not quite true. It's that the contract doesn't say where payment has to be made, does it? Well, Your Honor, if you look at the option agreement, it requires payment to LPS, and 217 Commercial Street, Suite 300, Portland, Maine. And then it defines LPS. But the payment provision specifically doesn't state where the payment has to be made? It's to be paid to LPS, which is defined as a main entity with a main address, Your Honor. Don't we have to start with where the contract was formed? Your Honor... They reached out to Illinois on a cold call to these people in order to interest them in making a deal on their limited partnership interest. That all occurred in Illinois, did it not? Your Honor, Judge Hornby addressed this in his opinion, which was thoughtful, and noted that this is an option contract and under applicable law, an option contract is effective when received. Well, that's the question, whether it was an option contract. He found that. You're correct. He was correct in that regard, Your Honor. Whether he was correct or not is another question as to whether that was true or not. Well, Your Honor, in this matter we have the option contract and then you have the assignment agreement. And I don't believe the parties contest that there was an option agreement that was concluded first. There's a difference as to whether it's effective as of perhaps signature in Illinois or receipt in Maine. As I understand, what the dispute is about is the failure to make the assignments and the fact that they didn't return payments to you that you had made to them. Is that basically right? Your Honor, the way I would describe it is that the limited partnership interest is essentially a payment stream. And LP Solutions purchased that payment stream from the defendants. After the assignment agreements were consummated at the solicitation of the defendants, there was a very large distribution from the partnership. And based on the large size of this distribution, there was what you might call seller's remorse. They did not forward those distributions to LP Solutions even though they had done so in the past. There's litigation going on in Illinois in which the partnership basically said, I believe, that the family members could not validly make the assignments that you wanted them to make after the initial payments. You're saying that that has really nothing to do with what led to the dispute between your parties? Yes, Your Honor. It's perhaps nuanced, but under the law of partnership, there's a difference between substitution as a limited partner and then assignment of an economic interest. And in the Illinois matter, the general partner has taken issue with what it views to be substitution of limited partnership status. To your client? Well, to LP Solutions, yes, with respect to different partnerships. In the Illinois matter, does the general partner say that the distributions cannot be assigned or simply that you cannot substitute without his approval? Your Honor, as referenced by defendants, there was an order that was issued in the Illinois matter, and I have a copy of it if the Court is interested. Why can't you answer the question? Well, yes, there is a distinction between assignment and substitution, and the Illinois Court found that as long as there's notice, you can assign the economic interest. There's no impediment there. So you do have a ruling that the economic interest assignment could have been made, only that the substitution... And we're not looking for substitution, Your Honor. Okay. This is about money. So why can't all this be solved in your Illinois case? Because this is about the million dollars that the defendants are retaining. This money's already been distributed. So the Illinois matter is addressed to the general partner and the general partner's obligations. So if the general partner receives notice as to future distributions, it can direct them in a certain fashion. But this is an amount of money that's already been distributed. Do you have a pending case in Illinois against these defendants? We tried to join them in the Illinois matter, but they... Do you have a separate... No, no, Your Honor, we don't. You're not allowed to join them, but that didn't mean that you could not separately sue them. Your Honor, the Illinois action that exists presently has pended for many, many years, and it's moved along terribly slowly. We prefer a Maine forum. Payments were required to be delivered to the State of Maine, and if you... Is there any reason to think you couldn't have sued them in Maine, in Illinois, on your theory? Well, I suppose we could sue them in Florida or South Carolina or Illinois or other states, but the State of Maine is the logical choice for a Maine entity where we have Maine connections. In this matter, not only the terms of the contracts, but also we have an authorization at the appendix 690 where you have the defendants reaching out to the State of Maine, providing authority to LP Solutions to act as their authorized agent in obtaining consent for the transfer, and also for providing this to the general partner, providing authority to offer information, financial information that they request on behalf of the limited partners. That goes to whether there was control and ongoing connection to the forum. We have multiple solicitations as well, including solicitation of the consummation of the assignment agreements by which the defendants receive tax benefits and also the benefit of the remainder of the consideration. When you reached out to them, you promised, essentially, it's in your interest to do this because there will be tax benefits, correct? That's the option agreement. So for 20 years, there was a proportional amount of distributions that were sent to LP Solutions. But from your answer, are you saying that that may be true for the option agreement, but they sought tax advice on the assignment agreement and that wasn't part of the deal? Under the option agreement, the distributions for the LPs, the limited partners, those were taxable to the limited partners. After the assignment, they were able to shift their tax burden to LP Solutions. So they obtained a tax benefit. They also obtained the remaining consideration. They solicited consummation of the assignment agreements. They saw that after Richard Bruce Dushyaswa passed on and received a large consideration payment, they too wanted to proceed to close out, to consummate the assignment agreements and shift the tax burden to LP Solutions. They did so. And for many years, they observed the agreement. They forwarded distributions. When there was a large distribution, they blocked it forwarding that distribution. They also retained the consideration. I submit, based on the connections to the forum and the equities, it's entirely fair and foreseeable that there is an action here. They're retaining the consideration and also the distributions. It gets back to whether Judge Hornby was right that there wasn't purposeful availment of Maine, that they didn't expect that. They didn't really.  And you say those limited numbers is enough to show purposeful availment. Where do you think that Judge Hornby has it wrong? Well, he declined to consider the collaboration and shift of tax liabilities. If you look at the exhibits, it's in the appendix starting at 668. This is when the Dutchess Hall Party solicited LP Solutions to consummate the assignments and also said that we want you to take the tax burden and also prepare a form 8082 to shift that tax burden. That's how it's done. And that occurred, but Judge Hornby declined to consider that as part of the contacts. And if you actually look at the Burger King factors, the bill should have been considered both for relatedness and for purposeful availment. He acknowledged the existence of the activity, and it does relate to our claims, but he declined to consider it as a contact for purposes of jurisdiction. Did he say it wasn't related? Well... I'm just trying to remember what he said. Yeah, yeah. And I am too, Your Honor. I was surprised that he didn't consider those, because if you look at the appendix, the page that I just referenced... Mr. Stahl asked you, so what was wrong with what Judge Hornby said? You said he should have considered this tax liability solicitation of assignments, the form B-2 or whatever it was, and that's the problem with his opinion. Is there another problem? I think if you look at the contracts, the consent, the granted authority, the solicitations, there's a misrepresentation also that's part of our claim in paragraph 55. Under the case Murphy v. Irwin, sending a misrepresentation in the form of a loan can serve as a jurisdictional contact. We also have numerous e-mails, consents, confirmations, checks, many checks, 15 checks. Okay. Thank you. Thank you, Your Honor. May it please the Court, Nolan Reichel for the Duchossois family. I'm joined at council table by my colleague, Kyle Noonan. Let me begin by addressing some of the specific questions that the panel asked of Mr. Murphy. First, Judge Thompson asked the question about the payment provision in the contract and whether or not it specified that payments are to be made to Maine. It does not. LPS relies on the fact that the contract identifies LPS as having an address in Maine, but it does not specify that to perform the payment obligations under the contract, the Duchossois family was to deliver the payments to Maine. And I would refer the Court to the opinion in Adams v. Adams, which has an identical fact. In Adams v. Adams, there was a promissory note, and the recipient of the payments under the promissory note was identified as residing in Massachusetts, but the note did not otherwise identify where the payments by the promisee were to be sent. And the Court relied on that fact in Adams v. Adams, and it said, well, even though it says that the recipient of the payments is in Massachusetts, it still doesn't say that to perform, payments must be sent there. But does it make a difference if they actually performed by sending the payments to Maine? Well, I think it depends. For relatedness purposes, we don't think so. The question for relatedness purposes is first, formation, and second, breach. If the contract did not require us to deliver payments into Maine, then we couldn't have breached in Maine when we failed to do that. I think for foreseeability purposes, the fact that the payments were sent to Maine is, we can see that's a relevant contact for purposes of foreseeability, but the key point there is that they were insignificant in number. If you contrast the number of payments in our case to the number of payments in cases like Baskin-Robbins or C.W. Downer. Well, if the payments, usually insignificant in number, but if the payments were made after they had been distributed to them by the general partner on the basis that they had received them, shouldn't that be sufficient? I don't think so, Your Honor. You think there's a numerical number at some point, if they, let's assume they had made two payments, that would have been enough in a year? Since the stream of payments went to Maine, why isn't that enough? Well, because I think the prior cases have drawn a pretty clear line between contracts that have led to an insignificant or small number of payments and contracts that have led to a very large number of payments. So the contrast I would draw would be between, for instance, Copia Communications, which only analyzes foreseeability and which includes a few discrete payments into the foreign jurisdiction, but nevertheless says, you know, that's just not enough. It's not enough payments. It's not enough contacts, versus something like Baskin-Robbins, which was a multi-decade franchise relationship with a large number of payments, or C.W. Downer with a very intense relationship with a large number of payments. So I do think the numerosity of the payment. He says, look, it was a 20-year arrangement under which, if it had gone the full 20 years, there would have been a large number of payments. And as to foreseeability, your clients knew it was a 20-year arrangement. Yes, except that the obligations were contingent under that 20-year period. There could have been years with no distributions, Your Honor. Yes, but the contract required the distributions. And when they were made, until the big one came, they paid them. And they paid them to Maine. That is true. So doesn't that show purposeful availment? I don't think so, Your Honor. Again, for the reasons I said, a small, discrete number of payments has not been treated that way, I think, by the Court's prior cases. Even though they're all the ones that are required by the contract. Yes, and I think that is the case in Copia, for instance. All the payments required in Copia were made. Okay, so you were going to answer, I think, three questions we had asked. Would you move on? I will. The question Judge Stahl asked before about where the contract was formed, there's two points on that. First, as a legal matter, we do think Judge Hornby was wrong in his analysis about where the contract was formed. He applied restatement section 63B, which is for option contracts, and we believe that the appropriate section is section 63A, which is for a typical contract. I think the confusion here is around the fact that these contracts were titled option contract, but that term is not the usage of the term option contract in the restatement. In the restatement, an option contract is a contract where the offeror's ability to revoke is limited by the offeror. There's nothing in the record to suggest that these were those sorts of contracts. So this was a standard contract under section 63A. Generally, that type of contract is formed when we give our assent and when we dispossess ourselves of the document. All of that happened in Illinois. Did it happen when it was received in Maine? No, it did not. Under section 63A, the contract is formed when you have dispossessed yourself of the agreement, and that happened in Illinois. So it's the mailbox rule, essentially. The second point on formation is putting aside what the restatement may say about when you've crossed the line into a formed contract, when contract law deems that to occur, that question doesn't change the facts of what actually happened. What actually happened was they called us in Illinois. We had no idea who they were or how they got our names and phone numbers. They then followed up with continued solicitations all directed into Illinois, and we never traveled to Maine to negotiate the contract. And so putting aside what contract law says about when the contracts were formed, from a personal jurisdiction perspective, the actual contacts as they occurred, with respect to formation, all of them occurred in Illinois. Well, your representatives on the second go-around were dealing with the people in Maine, were they not? In other words, when you rejected the first offer, you came back with basically a counteroffer, and they sweetened the offer. You reached into Maine with that counteroffer, did you not? I don't think so, Your Honor. I think what the record shows is they sent us these mailings out of the blue. We received them. They then followed up with a phone call into Illinois that they initiated. On that phone call, again, that they introduced into Illinois, we told them we don't like what you sent us. They said, well, we have option B. Why don't we send you option B? We then agreed to receive option B, but we didn't reach into Maine with any sort of counterproposal. We didn't draft any of these documents. They were all off the shelf and sent to us. And then I think I'd like to address the tax issue, if I may. I would direct the Court's attention to appendix page 114, which I believe temporarily is the first reference to this tax question, to this specific question about these 8082 forms. That is a letter from LPS, again, directed into Illinois, and the letter says the general partner thinks these transactions are not kosher. It doesn't agree with them. What we want you to do, or what we will ask you to do, is please send us your K-1s, and we will send you back the 8082 forms. So with respect to what I would call a dialogue between LPS and the Duchossois family over the 8082 forms, this was, again, a dialogue initiated by LPS with a mailing into Illinois, and that's reflected at page 114. Did Judge Hornby find that these were not related? Judge Hornby found, for relatedness purposes, yes, that the tax dialogue was not an appropriate factor to look at for relatedness because there's no nexus to their claims. They have no problem with us. They're concerned about the tax, but your argument is even if they were related, our opponent initiated the tax issue. Well, it's two points I'd like to make. With respect to relatedness, even if they were somehow related, it's a very de minimis factor compared with the fact that there was formation and breach both in Illinois. So that's what I would say with respect to the relevance of tax to relatedness. With respect to foreseeability, then yes, I make the point that you just made, Your Honor. With respect to foreseeability, they initiated the tax dialogue, not us. This is just a fact question. Have all the interests been sold to his client at this point? So the record shows that each of the five Dushaswa family members executed an assignment document that would, in our view, or at least what we think the purpose of the contracts was, the execution of that assignment would have served to transfer the entire partnership interest to LPS. But the general partner says that they're no good. But you have all the money. We have received all of the allegation, Your Honor, is that we have received all of the consideration due from LPS under the contracts. That's correct. And you kept the lion's share of the money which came out of the general partner when they refinanced. That's the alleged taxable event to the recipients, so it's a neat way to get money. So this is really, we go back to where we began. This is really about where do they get a quicker resolution of their problem, correct? That's correct. And we've said all along we think Illinois is a far more appropriate forum for this case. I mean, ultimately. So did you object to their intervention? No, we did not. We didn't. My clients have never appeared in the Illinois action. What occurred, I mean, we are, of course, quite interested in how the Illinois action resolves itself. And so what the record reflects is that we've had an attorney in Chicago sit, just as any member of the public would, to observe what's gone on. But, no, the Dishishaw family has never appeared as a party or a movement in the Illinois proceedings. So when it was represented to us that your client opposed making, in the Illinois case, making them necessary parties, do you disagree with that? I think that was an incorrect assertion, yes, Your Honor. Is there anything in the record one way or the other? Well, we have put in the record the entire docket, well, not up to date, but the district court had the entire docket as of the time of the district court proceedings. It does not reflect any entry that shows that the Dishishaw family was a party to those proceedings. Not whether you were a party, whether you entered an appearance, whether you filed an objection to being made necessary parties. It does not show that, and we did not, as far as I know, Your Honor. Okay. Let me just say we've addressed, I think, the foreseeability. Let me just say on relatedness. The two primary considerations that run through all of this court's jurisprudence on relatedness are questions of what are the contacts related to formation and what are the contacts related to breach. All of the formation and breach contacts, we argue, all occurred in Illinois, and we think you can affirm Judge Hornby's ruling based on his reasoning concerning foreseeability. We also think you can affirm Judge Hornby's ruling by finding for us on the relatedness prong as well, although he did not. Boy, I thought you were coming in here and defending the decision on the basis of the foreseeability and that you were more or less living with the relatedness. You're now asking us to essentially reverse him on relatedness. I don't think you need to, Your Honor, no. I want to be very clear. Well, switching gears from what you briefed to what you say at oral argument causes some problems for us. Well, we argued in the brief that Judge Hornby's order can be affirmed both on the relatedness analysis and on the foreseeability analysis. It would seem to me that as a matter of Maine law, the foreseeability issue is probably the more important of the two, and we are to make law. We are very happy to live with Judge Hornby's opinion on foreseeability. We think it was correct, and we think you should affirm it. Thank you. Your Honor, briefly, counsel for defendants mentioned there was a question about the delivery of payments to Maine under the contracts. Could you speak up a bit? Yeah, I'm sorry, Your Honor. Counsel for the defendants mentioned that there was a question about whether delivery of payments to Maine was a relevant contact at this juncture. Judge Hornby correctly noted that for purposes of jurisdiction, the actual course of dealing between the parties is relevant, and we do have payments that are being sent to Maine on a regular basis over a multiyear period. Counsel also made note of the quantity of payments. This court and also the Supreme Court have been very clear about not applying a mechanistic approach. It's every case that rises or falls on its own merits. There is a constellation of facts that have to be analyzed, and then this court makes a decision as to whether it's appropriate to maintain jurisdiction or not. So I don't think that there's any magic number of payments. The duration, if you look at Burger King, there's reference to the duration of the relationship as opposed to the number of payments per se, and I think that we have a very long duration here in this instance. With respect to the Illinois order, it's contained in the record at Appendix 721. It is true that the defendants did not enter an appearance in the matter, but the general partner on their behalf opposed joining the limited partners in the action and prevailed. The judge in Illinois held that it was not necessary to join the limited partners in that action, and also if you look at Appendix 446 in the transcript that was provided. But why wouldn't the general partner have its own interests totally apart from the limited partners' interests in taking that position? I don't know, Your Honor. I can't speak for the general partner. Maybe the general partner wants the involvement of the limited partners. Maybe the general partner does not want scrutiny and involvement of the limited partners. Well, I wouldn't think we'd automatically attribute to the general partner that it was the stalking horse for the limited partners. Well, Your Honor, even in the transcript provided by defendants at Appendix 446, there's reference to the Dushyaswap parties being present in the courtroom during proceedings. I would hope so. They had a lot of money at stake. If there are any further questions? No. Thank you, Your Honor. Appreciate it.